UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| SUN PHARMACEUTICAL INDUSTRIES, INC., and SUN PHARMACEUTICAL INDUSTRIES, LTD., | Civ. No. 23-20601 (RK)(JBD) OPINION (Public Version - Redacted) |
| Plaintiffs, | |
| v. | |
| BIOFRONTERA INC., BIOFRONTERA BIOSCIENCE GMBH, BIOFRONTERA PHARMA GMBH, and BIOFRONTERA AG, | |
| Defendants. | |

J. BRENDAN DAY, UNITED STATES MAGISTRATE JUDGE

Plaintiffs Sun Pharmaceutical Industries, Inc. and Sun Pharmaceutical Industries, Ltd. ("Sun") move to disqualify McGuireWoods LLP from continuing to represent defendants Biofrontera, Inc. ("BFRI"), Biofrontera AG, Biofrontera Bioscience GmbH, and Biofrontera Pharma GmbH (collectively, "Biofrontera"). Biofrontera opposes the motion. The Court has carefully considered the facts, the circumstances, the parties' arguments, their evidentiary submissions, and applicable law. For the reasons set forth below, the Court will deny the motion.

# I.   BACKGROUND

The Court sets forth in detail the factual background and procedural history relevant to Sun's motion.

## A.   Factual Background

The parties are competing producers of devices and drugs used in photodynamic therapy for the treatment of certain skin diseases.  This case arises from the alleged breach of a settlement agreement entered in November 2021, which resolved earlier litigation between the parties in Massachusetts.  That agreement ███████████████████████████████████████████████████████ ██████████████████.[1]

In this case, Sun alleges that Biofrontera breached the settlement agreement and violated state and federal law by engaging in unlawful off-label promotion of its Ameluz product in three specific ways.  First, Sun alleges that Biofrontera made impermissible promotional statements that suggested or implied that Ameluz may be used to treat cancerous or precancerous cells beyond actinic keratoses ("AKs").  Second, Sun alleges that Biofrontera made impermissible promotional statements that suggested or implied that Ameluz may be used to treat subclinical AKs.  Third, Sun alleges that Biofrontera provided samples of Ameluz to doctors who did not

---

[1]    "Off-label promotion" refers to the commercial promotion of a medical product or service for uses other than those for which the FDA has approved it.  The issues in this case arise from the friction between doctors' lawful ability to prescribe, in the exercise of their professional judgment, "off-label" (*i.e.*, unapproved) medical treatments, and manufacturers' legal inability to promote such treatments for off-label use.  *See Seavey v. Globus Med., Inc.*, Civ. No. 11-2240 (RBK), 2014 WL 1876957, at *14 (D.N.J. Mar. 11, 2014).

have specific types of Biofrontera lamps when Ameluz is approved for use only in conjunction with those lamps.[2]  These categories of marketing activity, Sun alleges, constituted off-label promotion of Biofrontera's products, in violation of federal and Massachusetts law and the settlement agreement, causing Sun economic harm.

Biofrontera denies Sun's allegations and counters that Sun engaged in three kinds of unlawful marketing of its own when promoting its competing Levulan Kerastick ("Levulan") product.  Because they underlie the present motion, the Court describes Biofrontera's counter-allegations in some detail.[3]  First, Biofrontera alleges that Sun unlawfully marketed Levulan as eligible for reimbursement under CPT code 96574 when, in fact, Levulan was not approved for the lesion debridement procedure associated with that code.[4]  Biofrontera asserts that Sun marketed Levulan to doctors as eligible for reimbursement under CPT code 96754 because the reimbursement rates for that code generally were higher than for other codes associated with procedures for which Levulan was approved.  Biofrontera asserts that Sun did this on the theory that doctors would be more likely to purchase and administer Levulan if they knew that they could receive higher reimbursements for

---

[2]     The Court recently granted Sun's motion to amend its complaint to permit it to add this third category of promotional activity.  [Dkt. 341.]

[3]     Biofrontera AG, Biofrontera Bioscience GmbH, and Biofrontera Pharma GmbH have yet to file an answer in this case.  Only BFRI has, as of the date of this opinion, formally asserted these counter-allegations against Sun.

[4]     Short for Current Procedural Terminology, CPT codes are five-digit codes widely used in the healthcare industry to create a uniform language for referencing specific medical procedures for, among other things, insurance claims processing.

performing the off-label debridement procedure on their patients.  Second, Biofrontera alleges that Sun's marketing materials misrepresented Levulan's efficacy.  Specifically, Biofrontera challenges Sun's asserted patient clearance rates, which are the rates of success that Sun claimed to have achieved through administration of Levulan.  In simple terms, Biofrontera accuses Sun of having falsely marketed Levulan as more successful in treating AKs than its clinical studies would permit.  Third, Biofrontera alleges that Sun's marketing materials contained false and misleading statements when comparing Levulan to Ameluz. In essence, Biofrontera accuses Sun of falsely promoting Levulan as having benefits that Ameluz does not, to encourage doctors and patients to choose Sun's product over Biofrontera's product.  All of Sun's promotional activity, Biofrontera asserts, violated federal law and New Jersey and Georgia law, and caused Biofrontera economic harm.  Sun denies Biofrontera's counter-allegations.

## B.    Procedural History

Sun initiated this action on June 28, 2023 by filing a complaint against BFRI in the United States District Court for the District of Massachusetts.  [Dkt. 1.] Lawyers from McGuireWoods entered their appearance for BFRI on September 21, 2023 and the firm has represented BFRI from the beginning.  [Dkt. 15.][5] The parties quickly agreed to transfer the case to this Court [Dkt. 16], and several

---

[5]    McGuireWoods also represented Biofrontera from the onset of the 2018 Massachusetts litigation that gave rise to the settlement agreement underlying Sun's claims here.

4

months later, on November 12, 2023, Sun filed an amended complaint that added as defendants five Biofrontera entities operating in Germany.[6]

In April 2024, BFRI moved to dismiss counts two and three of the amended complaint.  [Dkt. 75.]  On May 1, 2024, while the motion to dismiss was pending, the Court held a Rule 16 scheduling conference with Sun and BFRI.  Following the conference, the Court issued a scheduling order, and Sun and BFRI then began fact discovery.  [Dkt. 88.]  A few months later, on October 15, 2024, the Court denied BFRI's motion to dismiss.  [Dkts. 124, 125.]  Two weeks thereafter, on October 29, 2024, BFRI filed an answer and counterclaims against Sun, in which BFRI accused Sun of the false and misleading marketing activity described above.  [Dkt. 131.] On December 17, 2024, Sun filed an answer to BFRI's counterclaims, in which it asserted several affirmative defenses.  [Dkt. 141.]  Sun did not, and has not, asserted an advice-of-counsel defense in response to BFRI's counterclaims.  *Id.*

Meanwhile, as early discovery between Sun and BFRI progressed into 2025, the Court granted Sun's request to serve the foreign defendants through McGuireWoods, and service on those defendants was deemed effective as of March 12, 2025.  [Dkt. 177.]  Local counsel entered an appearance on behalf of the foreign defendants shortly thereafter, and the Court granted *pro hac vice* motions admitting counsel from another law firm to represent the foreign defendants as well.  [Dkts. 180, 190, 191.]  In June 2025, the foreign defendants filed a motion to

---

[6]    Sun later dismissed two of these entities, leaving Biofrontera Bioscience GmbH, Biofrontera Pharma GmbH, and Biofrontera AG as the foreign defendants.

dismiss the amended complaint and requested that the Court stay discovery as to them pending resolution of the motion.  On June 16, 2025, the Court denied that request and ordered the foreign defendants to begin written discovery immediately. [Dkt. 226.][7]  Two weeks later, McGuireWoods notified the Court that the firm would substitute in as counsel for the foreign Biofrontera defendants.  [Dkts. 238, 239.] The firm has represented both BFRI and the foreign defendants since that time.

Discovery has been both extensive and hotly disputed, requiring the Court to resolve numerous disputes and extend the pretrial schedule multiple times. The parties have exchanged hundreds of thousands of pages of written discovery (which is continuing) and are presently in the middle of fact depositions.  Under the current pretrial schedule, fact discovery closes in March 2026 and expert discovery closes in July 2026, although that schedule will be extended shortly.  A trial has not been scheduled.

### C.    Kevin Madagan's Representation of Sun and Subsequent Employment at McGuireWoods

On July 22, 2024, amidst the early proceedings and as Sun and BFRI began discovery, McGuireWoods notified Sun in a letter to Sun's counsel that as of that date, Kevin Madagan had joined the firm as a partner in its Washington, D.C. office.  [Dkt. 318-3] at 1.  Before his employment at McGuireWoods, Madagan had

---

[7]    In December 2025, the Court administratively terminated the foreign defendants' motion to dismiss pending resolution of Sun's motion to file a second amended complaint.  The Court recently granted Sun's motion to amend [Dkt. 341], and Sun filed its second amended complaint on January 27, 2026.  [Dkt. 348.] The Court has stayed Biofrontera's deadline to respond to it pending resolution of this motion.

been a regulatory lawyer at another law firm, Reed Smith LLP, and in that capacity had provided legal advice to Sun. Sun's motion to disqualify McGuireWoods arises because of that advice and Madagan's subsequent employment at McGuireWoods.

At the time it sent the letter, McGuireWoods represented only BFRI in this case. Nonetheless, McGuireWoods explained in the letter that it represented BFRI in other litigation as well, including one case pending before the U.S. Patent Trial and Appeal Board, in which it represented BFRI and the foreign defendants. *Id.* McGuireWoods recognized that its representation of Biofrontera in this case and the other cases "involv[ed] adversity" to Sun. *Id.* Accordingly, McGuireWoods explained that it would screen Madagan from this case and the others. *Id.* at 1-2. McGuireWoods noted that Madagan had not been involved in or consulted regarding these cases, and that his work for Sun had concluded in 2022. *Id.* at 1. McGuireWoods attached to the letter two affidavits—one that Madagan executed and one that a McGuireWoods representative executed—specifying the parameters of the ethics screen and affirming that Madagan would be apportioned no part of the fees derived from McGuireWoods's representation of Biofrontera in the affected cases. *Id.* (Attachments 1 & 2). McGuireWoods has represented that it and Madagan have fully adhered to the ethics screen and that it remains in place today.

### D.    Sun's Motion to Disqualify McGuireWoods

Sun did not immediately respond to McGuireWoods's July 22, 2024 letter and this case proceeded as the Court has described above.  Sixteen months later, the issue resurfaced.

In a letter to Biofrontera's counsel dated November 26, 2025, Sun's counsel expressed Sun's intent to move to disqualify McGuireWoods from continuing to represent Biofrontera in this case.  [Dkt. 318-4] at 1.  The letter stated that Sun had recently learned that while Madagan was employed at Reed Smith, he had "personally reviewed and provided legal advice" to Sun regarding the same Levulan marketing materials that Biofrontera challenges in its counterclaims.  *Id.* The letter further asserted that Sun's counsel had recently discovered, while preparing Sun witnesses for fact depositions, the extent of Madagan's involvement in advising on the Levulan-related materials at issue.  *Id.*  Sun noted a recent deposition of its national sales director, during which McGuireWoods lawyers had questioned him about materials highlighting Levulan's eligibility for reimbursement under CPT Code 96574.  *Id.*  Sun's counsel explained that upon further investigation, they learned that Madagan had provided legal advice to Sun specifically on the language in those and other materials regarding CPT Code 96574, which Biofrontera challenges in its counterclaims.  *Id.*  According to Sun, further investigation revealed Madagan's substantial involvement with Sun's Medical, Legal, and Regulatory ("MLR") Review Committee, and that

8

Madagan had provided regular legal advice to Sun on multiple issues at the core of Biofrontera's counterclaims. *Id.*

The upshot, Sun argued, is that Madagan had been Sun's "primary (and often sole) attorney for reviewing draft promotional, internal, and educational materials for Levulan from 2016 until 2023"; had "advised Sun Pharma on how to address Biofrontera's product, Ameluz, and ████████████████████████ ████████████████"; and had "provided legal advice to Sun Pharma about Biofrontera's off-label activities, including privileged communications in the lead-up to the parties' execution" of the settlement agreement underlying Sun's allegations in this case. *Id.* at 1-2.[8]

Given all this, Sun argued that Madagan's conflict was imputed to all lawyers at McGuireWoods and was ineligible for an ethics screen, thereby requiring disqualification of the entire firm. *Id.* at 2. Sun asked McGuireWoods to confirm that it would withdraw from representing Biofrontera in this case. *Id.* In a responsive letter dated December 4, 2025, McGuireWoods declined to withdraw. [Dkt. 318-5.] Sun filed its motion to disqualify on December 12, 2025, Biofrontera filed an opposition on January 6, 2026, and Sun filed a reply on January 20, 2026. [Dkts. 317, 331, 339.] The Court held oral argument on January 29, 2026.[9]

---

[8]     Sun acknowledged the July 22, 2024 letter from McGuireWoods notifying Sun that Madagan had joined the firm, but stated that at the time of the letter, "Biofrontera had neither filed counterclaims at that time nor identified the types of documents that it intended to claim are allegedly improper." [Dkt. 318-4] at 2 n.1.

[9]     Confident that the documentary record is sufficient to decide the motion, the Court did not hold an evidentiary hearing. *See Martin v. AtlantiCare*, Civ. No. 10-

## II. LEGAL FRAMEWORK

### A. Standards of Review

"The district court's power to disqualify an attorney derives from its inherent authority to supervise the professional conduct of attorneys appearing before it." *United States v. Miller*, 624 F.2d 1198, 1201 (3d Cir. 1980); *accord In re Corn Derivatives Antitrust Litig.*, 748 F.2d 157, 160 (3d Cir. 1984). In exercising that supervisory authority, the Court follows Local Civil Rule 103.1(a), which addresses professional standards of conduct in this Court. The rule provides that the "Rules of Professional Conduct of the American Bar Association as revised by the New Jersey Supreme Court shall govern the conduct of the members of the bar admitted to practice in this Court[.]" L. Civ. R. 103.1(a). Accordingly, the New Jersey Rules of Professional Conduct ("RPCs"), as New Jersey state courts interpret and enforce them, govern the Court's analysis below. *Delso v. Trustees For Ret. Plan For Hourly Emps. of Merck & Co., Inc.*, Civ. No. 04-3009 (TJB), 2007 WL 766349, at *5 (D.N.J. Mar. 6, 2007) (citing *Steel v. Gen. Motors Corp.*, 912 F. Supp. 724, 732 (D.N.J. 1995)).[10]

---

6793 (JS), 2011 WL 5080255, at *3 (D.N.J. Oct. 25, 2011) ("New Jersey case law is quite clear that a motion to disqualify should ordinarily be decided on the basis of affidavits and documentary evidence except where 'the court cannot with confidence decide the issue on the basis of the information contained in those papers.'") (quoting *Dewey v. R.J. Reynolds Tobacco Co.*, 536 A.2d 243, 253 (N.J. 1988)); *Twenty-First Century Rail Corp. v. N.J. Transit Corp.*, 44 A.3d 592, 596 n.3 (2012) (same).

[10]    Unless stated otherwise, all citations to the RPCs are to the New Jersey Rules of Professional Conduct. Additionally, unless indicated otherwise, citations

State and federal courts in New Jersey consistently have avoided *per se* rules of disqualification, recognizing instead that motions to disqualify are fact-dependent and context-specific, requiring the Court to engage in "painstaking analysis of the facts and precise application of precedent." *Martin v. AtlantiCare*, Civ. No. 10-6793 (JS), 2011 WL 5080255, at *2 (D.N.J. Oct. 25, 2011) (quoting *Steel*, 912 F. Supp. at 733). The Court must discharge its task "with a keen sense of practicality as well as a precise picture of the underlying facts." *Montgomery Acad. v. Kohn*, 50 F. Supp. 2d 344, 349 (D.N.J. 1999) (quoting *Gould, Inc. v. Mitsui Mining & Smelting Co.*, 738 F. Supp. 1121, 1126 (N.D. Ohio 1990)). "The decision whether to disqualify a law firm by imputation is best undertaken on a case-by-case basis, weighing the facts as they exist at the time the motion to disqualify is made." *Cardona v. Gen. Motors Corp.*, 942 F. Supp. 968, 976 (D.N.J. 1995).

Apprised of the facts, courts view motions to disqualify counsel with a skeptical eye out of concern that they are made tactically to separate a litigant from its counsel of choice. *See Prudential Ins. Co. of Am. v. Chelchowski*, Civ. No. 16-258 (MAH), 2017 WL 1549466, at *3 (D.N.J. Apr. 28, 2017). The delay and prejudice that result from disqualification motions also give cause for concern. *See id.* (noting that "even when they are made in good faith, motions to disqualify cause inevitable delay in the underlying proceedings and create added hardships to the opposing party"). For these reasons, "disqualification is considered a drastic measure that

---

and quotations omit all other quotation marks, footnotes, and omissions, adopt alterations, and add all emphasis.

courts should hesitate to impose except when absolutely necessary[,]" *Alexander v. Primerica Holdings, Inc.*, 822 F. Supp. 1099, 1114 (D.N.J. 1993), and the movant therefore bears a heavy burden to establish that disqualification is warranted. *United States ex rel. Bahsen v. Boston Sci. Neuromodulation Corp.*, 147 F. Supp. 2d 239, 243 (D.N.J. 2015) (quoting *Essex Chem. Corp. v. Hartford Accident & Indem. Co.*, 993 F. Supp. 241, 246 (D.N.J. 1998)).

All that said, although a "client's right to be represented by counsel of its choosing is an important one to be both cherished and protected," *Twenty-First Century Rail Corp. v. N.J. Transit Corp.*, 44 A.3d 592, 601 (N.J. 2012), the right is not absolute, since "there is no right to demand to be represented by an attorney or law firm disqualified because of an ethical requirement." *Bell v. Cumberland Cnty.*, Civ. No. 09-6485 (JS) 2012 WL 1900570, at *2 (D.N.J. May 23, 2022) (quoting *City of Atlantic City v. Trupos*, 992 A.2d 762, 771 (N.J. 2010)).

Consistent with courts' aversion to *per se* rules in this area, a violation of the relevant RPCs does not automatically require disqualification. *See Dewey*, 536 A.2d at 254 ("If the court concludes that disqualification is required under [the RPCs], it must then weigh that conclusion against the affected client's right to counsel of his or her choice."); *Miller*, 624 F.2d at 1201 ("Although disqualification ordinarily is the result of a finding that a disciplinary rule prohibits an attorney's appearance in a case, disqualification never is automatic."). Instead, "a motion for disqualification calls for [courts] to balance competing interests, weighing the need to maintain the highest standards of the profession against a client's right freely to choose his

counsel." *Trupos*, 992 A.2d at 771 (citing *Dewey*, 536 A.2d at 251). Balancing the parties' respective interests and burdens where a conflict issue arises serves the important interests that the RPCs are designed to uphold, but still "allows courts to fashion more equitable solutions to a conflict problem while still maintaining the high ethical standards of the profession." *Wyeth v. Abbott Lab'ys*, 692 F. Supp. 2d 453, 458 (D.N.J. 2010).

Applying these standards, the ultimate decision to disqualify (or not) rests in the Court's sound discretion. *Miller*, 624 F.2d at 1201.

### B.   Applicable Law

Sun moves to disqualify McGuireWoods based on Madagan's conflict arising from his prior legal advice to Sun while employed at another law firm. That conflict, Sun argues, is imputed to the entire McGuireWoods law firm and cannot be addressed through screening procedures. In this context, RPCs 1.9 and 1.10 set forth the governing rules of decision.

Rule 1.9, entitled "Duties to Former Clients," first provides that "[a] lawyer who has represented a client in a matter shall not thereafter represent another client in the same or a substantially related matter in which that client's interests are materially adverse to the interests of the former client unless the former client gives informed consent confirmed in writing." RPC 1.9(a). Rule 1.9(b) then provides in full:

> (b) A lawyer shall not knowingly represent a person in the same or a substantially related matter in which a firm with which the lawyer formerly was associated had previously represented a client,

> (1)  whose interests are materially adverse to that person; and
>
> (2)  about whom the lawyer, while at the former firm, had personally acquired information protected by RPC 1.6 and RPC 1.9(c) that is material to the matter unless the former client gives informed consent, confirmed in writing.
>
> Notwithstanding the other provisions of this paragraph, neither consent shall be sought from the client nor screening pursuant to RPC 1.10 permitted in any matter in which the attorney had sole or primary responsibility for the matter in the previous firm.

RPC 1.9(b).

RPC 1.10, in turn, is entitled "Imputation of Conflicts of Interest: General Rule." As the title suggests, it prescribes rules for imputing an individual lawyer's conflicts to that lawyer's firm. Relevant to this case, RPC 1.10(a) provides that "[w]hen lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by . . . RPC 1.9[.]" RPC 1.10(a). Rule 1.10(c), critical here, provides:

> (c)  When a lawyer becomes associated with a firm, no lawyer associated in the firm shall knowingly represent a person in a matter in which that lawyer is disqualified under RPC 1.9 unless:
>
> (1)  the matter does not involve a proceeding in which the personally disqualified lawyer had primary responsibility;
>
> (2)  the personally disqualified lawyer is timely screened from any participation in the matter and is apportioned no part of the fee therefrom; and
>
> (3)  written notice is promptly given to any affected former client to enable it to ascertain compliance with the provisions of this Rule.

RPC 1.10(c).

14

The term "primary responsibility," as used in RPCs 1.9 and 1.10, "denotes actual participation in the management and direction of the matter at the policy-making level or responsibility at the operational level as manifested by the continuous day-to-day responsibility for litigation or transaction decisions." RPC 1.0(h).  The term "proceeding," as used in RPC 1.10(c)(1), is not defined.

## III.  DISCUSSION

Sun's motion to disqualify McGuireWoods turns on the nature, extent, and import of Madagan's previous representation of Sun.  The Court first asks whether the RPCs disqualify Madagan from representing Biofrontera in this case.  If so, the Court then examines whether RPC 1.10 imputes the conflict to the entire McGuireWoods law firm, or whether 1.10(c) permits other McGuireWoods lawyers to represent Biofrontera with Madagan screened from this case.  If the Court concludes that the rule does not permit screening here, the Court balances relevant interests and burdens to determine if disqualification is warranted.

### A.    Pursuant to RPC 1.9(a), Madagan is disqualified from representing Biofrontera in this case.

"[W]hether [Madagan] has a conflict of interest under [RPC] 1.9(a) affects whether the conflict is imputed to [McGuireWoods]" under RPC 1.10.  *Ford Motor Co. v. Edgewood Props., Inc.*, Civ. No. 06-1278 (ES), 2011 WL 5080347, at *3 (D.N.J. Oct. 25, 2011).  The Court therefore starts with that threshold question. While employed at another law firm, Madagan provided regulatory and compliance advice to Sun over a six-year period in connection with its promotion of Levulan. In its counterclaims, Biofrontera now asserts that statements Sun made as part of

15

its promotion of Levulan—including statements and documents that Madagan himself advised on or approved while representing Sun—were unlawful.  Given that context, RPC 1.9(a) disqualifies Madagan from representing Biofrontera in this case.  He previously represented Sun in a matter that was the same as or substantially related to this case[11]; and here, Biofrontera's interests are directly and materially adverse to Sun's.  Even if it were permissible under RPC 1.9, Sun has not given informed written consent for Madagan to represent Biofrontera here, so he may not do so.  Biofrontera does not argue otherwise and conceded the point at oral argument.

The crux of the dispute here is whether Madagan's disqualification under RPC 1.9(a) requires disqualification of the entire McGuireWoods law firm under RPC 1.10, or whether RPC 1.10(c) permits other lawyers at McGuireWoods to represent Biofrontera with Madagan screened from the case.  The Court turns to that question.

### B.    In light of Biofrontera's counterclaims, RPC 1.10(c) imputes Madagan's RPC 1.9(a) conflict to McGuireWoods and prohibits screening.

Sun's motion to disqualify McGuireWoods turns on RPC 1.10(c)(1), and whether this litigation "involve[s] a proceeding in which [Madagan] had primary

---

[11]    Biofrontera does not dispute that Madagan provided legal advice to Sun in connection with a "matter."  The Court also need not decide whether this case is the "same" matter as the matter in which Madagan advised Sun.  *See Twenty-First Century Rail*, 44 A.3d at 598-601.  Given the issues that Biofrontera's counterclaims raise in this case, the two matters are, at minimum, "substantially related."  *See Trupos*, 994 A.2d at 773-74.

responsibility[.]"[12]  Sun argues that it does; Biofrontera argues that it does not. To resolve the dispute, the Court first examines whether this case "involves a proceeding" in which Madagan gave Sun legal advice germane to this case.  If so, the Court then asks whether Madagan had "primary responsibility" for that "proceeding."

In interpreting these constituent clauses, the Court applies "ordinary principles of statutory construction to interpret the court rules." *DiFiore v. Pezic*, 296 A.3d 425, 434 (N.J. 2023); *see also Robertelli v. N.J. Off. of Atty. Ethics*, 134 A.3d 963, 971 (N.J. 2016) (citations omitted).  The Court "begin[s] with the plain language of the rule, and ascribe[s] to the words of the rule their ordinary meaning and significance and read[s] them in context with related provisions so as to give sense to the court rules as a whole." *DiFiore*, 296 A.3d at 434 (cleaned up); *accord In re Opinion No. 735 of Supreme Ct. Advisory Comm. on Pro. Ethics*, 334 A.3d 1188, 1195-97 (N.J. 2025) (interpreting RPCs 7.2 and 8.4 by examining the text of the relevant rules).  "If the plain language is clear and unambiguous, then '[the Court's] interpretative process is over.'" *State v. Smith*, 276 A.3d 1114, 1122 (N.J. 2022).

Of course, "it is well settled that statutory construction should not turn on literalisms, but on the objectives of the legislation and the common sense of the

---

[12]    Sun has identified no basis to disqualify McGuireWoods under RPC 1.10(c)(2) or (c)(3).  McGuireWoods provided timely written notice to Sun that Madagan had joined the firm in July 2024 and that it would screen him from this case.  The Court also has been given no reason to believe that the ethics screen has been breached, or that Madagan has received any fees earned from this case.

situation." *Smith v. Fireworks by Girone, Inc.*, 850 A.2d 456, 466, *modified on clarification*, 861 A.2d 843 (N.J. 2004) (rejecting the Appellate Division's "literal and hyper-technical interpretation" of statute).  If the language is ambiguous, the Court may turn to extrinsic materials, including committee reports and other historical materials.  *Cashin v. Bello*, 123 A.3d 1042, 1046 (N.J. 2015).  Ambiguity can arise when a rule "is subject to varying plausible interpretations." *Id.*

### 1.  *This case involves a proceeding in which Madagan provided legal advice to Sun.*

The Court first asks whether this case "involve[s] a proceeding" in which Madagan gave Sun legal advice germane to this case.

The word "involve" means, as relevant here, "to relate closely"; "to have within or as part of itself"; "to require as a necessary accompaniment"; and "to affect."  *Involve*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/involve (last visited Feb. 24, 2026).  In its counterclaims, Biofrontera challenges the lawfulness of Sun's promotion of Levulan.  Thus, this case clearly "involves" Sun's promotion of Levulan, a subject on which Madagan provided extensive legal advice to Sun.  For RPC 1.10(c)(1) to bar screening, then, this case must be *affected by* or *closely related to* a "proceeding" that concerned Sun's promotion of Levulan.  The Court therefore turns to the word "proceeding."

Biofrontera argues that, for purposes of RPC 1.10(c)'s screening rules, a "proceeding" means a more limited subset of "matters," differentiated by hallmarks of formality and party adversity before a court, tribunal, or other neutral authoritative body or decisionmaker.  In Biofrontera's view, RPC 1.10(c) prohibits

18

screening only where there was a lawsuit, hearing, or similar formal means of seeking redress from which the disqualified lawyer's conflict arises. Sun disagrees, arguing that "proceeding" in RPC 1.10(c) is synonymous with "matter" and therefore sweeps more broadly to cover general legal representation not directly tied to a formal case or controversy.[13]

The Court notes at the outset that the question presented here is one of first impression. No court, state or federal, has addressed the meaning and scope of RPC 1.10(c)(1)'s undefined term "proceeding," and the historical record provides limited insight. Applying the traditional tools of interpretation, the Court concludes that Sun has the best reading of the rule.

### a.    Text, Context, and Structure

The Court begins with the text—the meaning of the word "proceeding" and its context and operation within RPCs 1.9 and 1.10 and the RPCs as a whole.

Biofrontera's argument rests on the ordinary understanding of the word "proceeding." Black's Law Dictionary defines the term as "[t]he regular and orderly progression of a lawsuit, including all acts and events between the time of commencement and the entry of judgment"; "[a]ny procedural means for seeking redress from a tribunal or agency"; "[a]n act or step that is part of a larger action";

---

[13]    Sun's moving brief does not address the issue and appears to assume that Madagan provided his legal advice in connection with a "proceeding." Biofrontera invites the Court to find that Sun has forfeited its ability to argue that Madagan's advice occurred during a "proceeding" because it did not specifically argue the point in its moving brief. Given the importance and novelty of the issue, the Court declines the invitation and addresses the merits.

and "[t]he business conducted by a court or other official body; a hearing."

*Proceeding*, Black's Law Dictionary (12th ed. 2024).  These definitions, by and large, describe an official procedure or legal action of some kind, by which a party formally seeks relief, redress, a declaration of rights, or some other form of decision, judgment, or action by a court, tribunal, or other decision-making body.  Black's goes on to describe numerous specific kinds of "proceedings," all of which relate to some form of formal means of seeking relief, redress, action, or a declaration of rights or status.[14]  Similarly, the Merriam-Webster Dictionary defines "proceeding" as "a legal action," *Proceeding*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/proceeding (last visited Feb. 24, 2026), thus describing formal or official business before a court or other authoritative body.[15]

---

[14]    A non-exhaustive list of the specific proceedings identified are: "bankruptcy proceeding"; "civil proceeding"; "collateral proceeding"; "competency proceeding"; "core proceeding"; "criminal proceeding"; "custody proceeding"; "*ex parte* proceeding"; "informal proceeding"; "involuntary proceeding"; "judicial proceeding"; "legal proceeding"; "non-core proceeding"; "parallel proceeding"; "post-trial proceeding"; "proceeding *in rem*"; "proceeding quasi *in rem*"; "quasi criminal proceeding"; "summary proceeding"; and "supplemental proceeding."  *Proceeding*, Black's Law Dictionary (12th ed. 2024).

[15]    *But see Proceeding*, Oxford English Dictionary, https://www.oed.com/dictionary/proceeding_n?tab=meaning_and_use#28488902 (last visited Feb. 24, 2026) (including a more general definition of "proceeding" as "[a] particular action or course of action; a piece of conduct or behaviour"; "doings, actions; (more generally) matters").  It is important to recognize, however, that this more general definition follows the Oxford English Dictionary's "Law" definition for "proceeding," which is "[a] legal action or process; any act done by authority of a court of law; a step taken by either party in a legal case").

Although the word "proceeding" sometimes can refer more generally to a step taken or to an act or action, in the legal context, courts have understood "proceeding" to refer more precisely to lawsuits or similar formal actions seeking redress. *See, e.g., Edwards v. A.H. Cornell & Son, Inc.*, 610 F.3d 217, 223 (3d Cir. 2010) ("A 'proceeding' is commonly defined as 'the regular and orderly progression of a lawsuit' or the 'procedural means for seeking redress from a tribunal or agency.'") (quoting Black's Law Dictionary (9th ed. 2009)); *Delaney v. Penza*, 376 A.2d 1334, 1338 n.3 (N.J. Sup. Ct. App. Div. 1977) (relying on the then-extant Black's definition, reading the word in the same "particular sense": "The term 'proceeding' [as used in several New Jersey statutes] is defined in a 'particular sense' in Black's Law Dictionary . . . as . . . "any application to a court of justice, however made, for aid in the enforcement of rights, for relief, for redress of injuries, for damages, or for any remedial object."). Consistent with this understanding, the RPCs also repeatedly use the word "proceeding" to refer to official hearings, actions, or business before a court or other decision-making body.[16]

---

[16]    *See* RPC 1.0(n); 1.7(b)(4); 1.11(e)(1); 3.1; 3.3(b), (d); 3.6; 3.8; 3.9; and 5.5(b)(1), (b)(3)(iii).  In particular, Biofrontera emphasizes that RPC 1.11(e)(1) references "proceedings" as a subset of "matters" when defining the latter term. *See* RPC 1.11(e)(1) (defining "matter," specifically "[a]s used in th[at] [r]ule," to "include[] any judicial or other proceeding, application, request for a ruling or other determination, contract, claim, controversy, investigation, charge, accusation, arrest or other particular matter involving a specific party or parties; and any other matter covered by the conflict of interest rules of the appropriate government agency").

All of this, at first blush, appears to give Biofrontera a strong textual argument that RPC 1.10(c)(1)'s use of the word "proceeding" narrows the circumstances in which a firm is prohibited from screening an incoming lawyer with a Rule 1.9 conflict—*i.e.*, only when the conflicted lawyer's representation of a prior client arose out of a lawsuit, hearing, or formal action before a court, tribunal, or decision-making body.

However, upon closer examination and when read in the specific context of RPCs 1.9 and 1.10, Biofrontera's literal reading does not hold up so strongly. The Court must "read the language of a rule in context with related provisions so as to give sense to the court rules as a whole." *Robertelli*, 134 A.3d at 971. Two provisions in the relevant RPCs strongly support Sun's textual argument that, in this specific context, "proceeding" and "matter" are used interchangeably. A third provision in the RPCs, moreover, is best read also to support Sun's interpretation.

*First*, the defined term "primary responsibility" means "actual participation in the management and direction of the *matter* at the policy-making level or responsibility at the operational level as manifested by the continuous day-to-day responsibility for litigation or *transaction decisions*." RPC 1.0(h). The question whether a conflicted lawyer had "primary responsibility" is the litmus test for a law firm's ability to screen the lawyer under RPC 1.10(c). It would be odd to define that critical term by asking about the lawyer's managerial or operational control over a prior "matter," but then immediately limit the operation of that definition through the use of the separate and undefined term "proceeding." Additionally, the

definition of "primary responsibility" specifically contemplates the conflicted lawyer's control over "transaction decisions," which, of course, often includes pre-litigation situations.

Accordingly, the definition of "primary responsibility" itself is a textual clue that lawyers who advise on transactional and other pre-litigation "matters" are potentially subject to RPC 1.10(c)'s screening limitation if they switch firms. As a leading treatise explains, "[t]he RPCs do not define 'proceeding'; the definition of 'primary responsibility,' however, clarifies that the same screening rules will apply in the context of both prior litigation matters and prior transactional matters." Kevin H. Michels & Kathryn Hockenjos, *New Jersey Attorney Ethics*, § 25:4-2 (Gann 2026) (hereafter, "*N.J. Attorney Ethics*").[17]

*Second*, buttressing the textual clue above is the structure and operation of the relevant rules themselves. More specifically, RPC 1.9 and RPC 1.10 each cross-reference the other, making them interdependent in application. Accordingly, the Court must interpret the words in both rules in a way that renders them consistent and coherent. *State v. Gomes*, 288 A.3d 825, 830 (N.J. 2023) (citations omitted) ("When interpreting different statutory provisions, we are obligated to make every

---

[17]    Accordingly, RPCs 1.9 and 1.10 apply to conflicts arising from transactional matters that do not involve litigation at all. So, for example, an RPC 1.9 conflict could arise from a transactional lawyer's initial representation of a buy-side client who then obtains new employment at a firm that represents the seller in the same or a substantially related transaction. Biofrontera's interpretation of RPC 1.10(c)(1) would have the anomalous effect of requiring a prior lawsuit (or similar formal action) in that purely transactional situation before imputing such a conflict to the lawyer's new firm.

effort to harmonize them, even if they are in apparent conflict.").  As an initial observation, imputation to a firm under RPC 1.10 derives entirely from an individual lawyer's conflict arising from his or her previous "represent[ation of] a client in a matter" that is "the same or substantially related" to the present "matter."  RPC 1.9(a).  This use of "matter" offers a clue that RPC 1.10(c) is not designed to operate only where more limited "proceedings" are concerned.

More importantly, RPC 1.9(b) sometimes permits a lawyer's former client to give informed written consent for the lawyer to represent an adverse party in the same or substantially related matter when the lawyer's former law firm represented the former client.  But the rule then prohibits such informed consent—and expressly prohibits "screening pursuant to RPC 1.10"—if the attorney had "sole or primary responsibility for *the matter* in the previous firm."  RPC 1.9(b)(2).  RPC 1.9(b)(2)'s cross-reference must refer to RPC 1.10*(c)* because that paragraph is the one that authorizes screening.[18]  Thus, RPC 1.9(b)(2)'s cross-reference is a powerful textual indication that the RPCs do not permit "screening pursuant to RPC 1.10[(c)]" where a conflicted lawyer previously had "primary responsibility" over a "matter."  In this way, RPC 1.9(b)(2) explicitly informs the interpretation of RPC 1.10(c)(1)'s use of the term "proceeding" and places it in a specific context.

---

[18]    During oral argument, Biofrontera resisted this understanding, suggesting that RPC 1.9(b)(2)'s reference to "screening pursuant to RPC 1.10" instead references RPC 1.10(f), which governs the mechanics of screening.  Even if true— which the Court doubts but need not resolve—the reference is not *only* to paragraph (f).  The phrase "screening pursuant to RPC 1.10" at least *includes* reference to RPC 1.10(c).

In short, to read these two provisions harmoniously, "proceeding" in RPC 1.10(c)(1) must mean the same thing as "matter" in RPC 1.9(b)(2).[19]

*Third*, RPC 1.12(a) provides that "a lawyer shall not represent anyone in connection with a *matter* in which the lawyer participated personally and substantially as a judge or other adjudicative officer, arbitrator, mediator or other third-party neutral, or law clerk to such a person, unless all parties to the *proceeding* have given consent, confirmed in writing." RPC 1.12(a). This provision is somewhat ambiguous and both parties rely on it to support their positions. Biofrontera argues that RPC 1.12(a)'s reference to "matter" is modified by reference to adversarial actions that include a judge or other decisionmaker, thus indicating that the later reference to "the proceeding" refers only to that subset of matters. Sun, by contrast, argues that this sentence demonstrates that "matter" and "proceeding" can mean the same thing in the context of the rules. Each party's reading is plausible, but in the Court's view, Sun's reading is more natural:

---

[19]    During oral argument, Biofrontera argued that this reading renders RPC 1.9(b)(2) incompatible with RPC 1.10(d) because the former prohibits seeking informed consent from a former client while the latter permits it. The Court disagrees. RPC 1.10(d) provides that "[a] disqualification prescribed by this rule may be waived by the affected client under the conditions stated in RPC 1.7." Read together, RPC 1.10(d) permits a firm to seek and obtain informed consent from one of its lawyer's former clients to represent an adversary even though the firm's lawyer had previously represented the former client in the same or related matter. But when such a lawyer had primary responsibility for the matter at the prior firm, RPC 1.9(b)(2) takes informed consent (and screening) off the table. In this way, RPC 1.9(b)(2) fortifies RPC 1.10(c)(1)'s primary responsibility limitation. The Court sees no incompatibility.

The provision first references "a matter," and then refers back to "the proceeding," thus equating the two terms.

Finally, the Court observes that Biofrontera's literalist argument produces troublesome line-drawing problems that Sun's reading does not. Biofrontera appears to accept that screening would be prohibited where a lawyer with primary responsibility drafts a complaint on a client's behalf but leaves his or her firm a day, week, or month before filing the lawsuit—and thus before any formal "proceeding" has begun—and then joins the firm that seeks to represent the defendant in the resulting action. But what about the lawyer who investigates and coordinates the client's litigation strategy but leaves months or years before the complaint is drafted and joins the firm that later seeks to represent the defendant? Or what about the lawyer who leads an invasive internal investigation and learns extensive information about a client's misconduct, but then switches to the firm that seeks to represent the plaintiff who sues the client years later over that misconduct? It is far from clear whether pre-litigation representation in these circumstances would, in Biofrontera's telling, be a "proceeding" sufficient to bar screening of the side-switching lawyer. Biofrontera's plain-meaning argument generates these and similar questions but yields no principled answers. In short, the term "proceeding," as used in RPC 1.10(c), is not as clear and unambiguous as Biofrontera suggests.

***

Examining the text, context, and structure of the rule does not yield an obvious answer to the meaning of "proceeding" in RPC 1.10(c)(1). Both sides have

plausible textual arguments in their favor.  When read in context, though, what stands apart is RPC 1.9(b)(2)'s specific cross-reference prohibiting "screening pursuant to RPC 1.10" when a conflicted lawyer had "primary responsibility" over a "matter."  Even acknowledging that the word "proceeding" has a commonly understood meaning, RPC 1.9(b)(2)'s cross-reference to RPC 1.10 and the definition of "primary responsibility" inform the best context-specific reading of the term in RPC 1.10(c)(1).  *See N.J. Attorney Ethics*, § 25:3-1(a) (acknowledging that "although the term [proceeding] would seem to connote litigation," in context, "[t]he better and safer analysis is that the term 'proceeding' extends to litigation and transaction matters").  All things considered, Sun has the better textual argument.

### b.    History and Purpose

The rule's text, context, and structure do not supply a clear answer to the meaning of "proceeding," but best support Sun's interpretation.  Finding the term ambiguous, the Court turns to RPC 1.10(c)'s history and purpose.  Although not dispositive either, they also support Sun's reading.

<u>History</u>.  The Supreme Court of New Jersey adopted the current version of RPC 1.10 in 2004 amendments to the rules.  Those amendments were recommended by an *ad hoc* Commission on the Rules of Professional Conduct, colloquially referred to as the "Pollock Commission."[20]  The Supreme Court created the Commission in 2001 following the American Bar Association's recommended updates to the

---

[20]    In honor of the Commission's chair, retired New Jersey Supreme Court Justice Stewart G. Pollock.

Model RPCs in 2000.  For two years, the Pollock Commission engaged in a significant effort to recommend amendments to the RPCs by meeting in subcommittees and plenary sessions and conducting public hearings on a series of proposed amendments.  *See* Supreme Court of New Jersey, *Administrative Determinations in Response to the Report and Recommendations of the Supreme Court Commission on the Rules of Professional Conduct*, at 1 (Sept. 10, 2003) (hereafter, "*Administrative Determinations*"), https://www.gannlaw.com/OnlineApp/dtSearch-Data/TextFiles/Ethics/A-1.pdf (last visited Feb. 24, 2026).[21]  In December 2002, the Commission filed a comprehensive report with the New Jersey Supreme Court, recommending various amendments to the RPCs, including those relevant here.  *Id.*  In September 2003, after receiving public responses to the Commission's recommendations, the Supreme Court adopted, as relevant here, the Pollock Commission's recommendations, and they became effective in 2004.  *Id.*

Before the 2004 amendments, neither the New Jersey version of RPC 1.10 nor the ABA Model Rule 1.10 contained a screening mechanism for conflicted lawyers joining a new firm.  *See Administrative Determinations*, at 11; *Martin*,

---

[21]    The Supreme Court issued this document on September 23, 2003 and it appears as Appendix A-1 to the *New Jersey Attorney Ethics* treatise cited herein. The document contains, in one place, the Pollock Commission's specific recommendations set forth in its final report, the Commission's commentary regarding the proposed rule amendments, and the Supreme Court's action in response to the recommendations.  For expediency, the Court refers to and cites this document, rather than the Pollock Commission's report itself, when discussing the Commission's recommended rule changes and its commentary.  Page citations are to the PDF version of the document.

2011 WL 5080255, at *4 n.8.  Accordingly, when a lawyer with an RPC 1.9 conflict joined a new law firm, that "ordinarily would mandate the disqualification" of the entire firm, full stop.  *Dewey*, 536 A.2d at 251 (quoting RPC 1.10(a)).  The Pollock Commission, however, supported adopting a screening rule generally consistent with the ABA's 2000 proposal to add a screening option to the model rules, but with additional guardrails.  *Administrative Determinations*, at 11.  In a public hearing held in May 2002, the Commission's vice chair explained that the commissioners had discussed the proposed screening rule at length and that it had not been "idly reached."  *N.J. Supreme Ct. Comm'n on the Rules of Pro. Conduct: Public Hearing*, at 34 (May 21, 2002) (hereafter, "*Pub. Hr. Tr.*"), https://dspace.njstatelib.org/server/api/core/bitstreams/cdb86080-5761-440b-a14d-03858210450d/content (last visited Feb. 24, 2026).  He explained the impetus for prohibiting screening where lawyers had "primary responsibility":

> It appeared to us, and this is now from all places on the spectrum, that if the attorney for the plaintiff or the attorney *leading the transaction* for one party actually goes to the other firm, that that would simply be too much.  We were interested, many of us, in screening to make sure that younger lawyers were protected so that if they were with a large firm and tried to go with somebody else, they didn't have this thing hanging around their neck.  But we thought if the main man or woman switches sides, that that simply wouldn't do.

*Id.*

In its final report, the Pollock Commission noted that although the ABA had by that time withdrawn the proposed model screening rule, the "Commission continue[d] to favor the use of screening to prevent the attribution of personal conflicts to other lawyers in a conflicted lawyer's firm but with some further

29

limitations on its use." *Administrative Determinations*, at 11.  The New Jersey Supreme Court adopted the recommendation in full, and RPC 1.10(c)'s screening option was born.  *Id.*[22]

Given the relationship between RPCs 1.9 and 1.10 discussed above, also relevant is the Pollock Commission's proposed revision to RPC 1.9(b), which contained the critical cross-reference to RPC 1.10.  Reflecting the language of the proposed rule—and consistent with the Court's textual analysis of RPC 1.9(b)(2) above—the Commission "recommend[ed] the addition of a new subparagraph (b)(3), which prohibits screening where the attorney had sole or primary responsibility for the *matter* in the lawyer's previous firm." *Administrative Determinations*, at 10. The Supreme Court adopted the Commission's recommendation but placed the provision at the end of paragraph (b)(2) instead of making it an additional subparagraph (b)(3).  *Id.*

This history, while not entirely illuminating, is consistent with and supports Sun's broader interpretation of "proceeding" in RPC 1.10(c)(1).  Adding the screening option to RPC 1.10 "constitute[d] a major change in New Jersey's approach to the question of imputed disqualification in the context of representation adverse to a former client."  *N.J. Attorney Ethics*, § 24:3-1(b).  Starting from a

---

[22]    The ABA later adopted a model screening rule which, today, is more permissive than New Jersey's rule.  The model rule now allows a law firm generally to screen a lawyer from matters in which that lawyer has a disqualifying conflict arising from his or her representation of a client while employed by a prior law firm. Like the rule that most states have adopted, the model rule does not contain a "primary responsibility" limitation.  *See* Model Rules of Pro. Conduct 1.10(a)(2).

baseline rule that did not permit screening at all, the amendment continued that general rule, but with an exception, permitting a firm to screen a conflicted lawyer "in narrowly defined circumstances." *N.J. Attorney Ethics*, § 24:3-1; *see also Mir v. Nadeem*, 2024 WL 5001747, at *5 n.4 (N.J. App. Div. Dec. 6, 2024), *leave to appeal denied*, 260 N.J. 12 (2025) (observing that RPC 1.10(c) is an "exception" to RPC 1.10's general imputation rule). This is consistent with a broader interpretation of "proceeding" that permits screening in a narrower category of cases. *See N.J. Attorney Ethics*, § 24:3-1 (explaining that "screening does not remedy an imputed . . . RPC 1.9 conflict unless the disqualified attorney had less than primary responsibility in representing the now-adverse party while at a previous firm," and that if an "an attorney had primary responsibility for [a] matter before switching firms . . ., screening would not cure the imputed conflict"); *Administrative Determinations*, at 11 (explaining that the "Commission continue[d] to favor the use of screening . . . but with some further limitations on its use"); *Pub. Hr. Tr.* at 34 (noting that if the Commission "bought into screening," it "needed to have certain additional protections").

Despite this shift in approach, Biofrontera has not identified any relevant discussion in the historical record supporting its proposed limitation that requires a formal legal "proceeding," and this Court has located none. If the Pollock Commission or the New Jersey Supreme Court had intended to generate a narrower screening prohibition through the word "proceeding," one would expect there to have been some discussion on the topic. On the contrary, however, all of the

31

discussion surrounding the proposed screening rule—at a time when the ABA had foregone screening for the model rules—was framed in terms of whether a conflicted lawyer had primary responsibility over a "matter" or a "transaction" rather than a formal "proceeding" at his or her prior firm.

In fairness to Biofrontera, RPC 1.10(c)'s history does not reflect that the Pollock Commission specifically considered or discussed the definition and scope of "proceeding" in recommending the rule. Indeed, the Court doubts that, for all the Commission's significant efforts, it gave any attention to this particular issue, since disputes regarding imputation and screening unfold most often in the context of a side-switching lawyer in the same or related litigation. For this reason, the Court does not place overwhelming weight on the provenance of the term "proceeding" in the rule or on the references to "matters" and "transactions" during the sessions that led to the rule's adoption.

But the Court does place some weight on that history. Reading "proceeding" to equate with "matter" in RPC 1.10(c)(1) is consistent with the textual analysis above and is further consistent with the Pollock Commission's overall approach to adopt a careful, narrowly defined screening rule that does not permit screening of the "main man or woman" whose previous representation of a client touches on issues at the center of subsequent litigation. *See N.J. Attorney Ethics*, § 25:1 ("Despite the more liberal approach of the 2004 RPCs, however, it is important to understand that the rule amendments have *not* sanctioned screening as a cure for

32

the vast majority of conflicts faced by attorneys, including those arising from" RPC 1.9 conflicts) (emphasis in original).

_Purpose_.  A broader interpretation of "proceeding" in RPC 1.10(c)(1) also is consistent with the rule's "purpose," which "animates its meaning." *United States v. Pelle*, Crim. No. 05-407 (JBS), 2007 WL 674723, at *5 (D.N.J. Feb. 28, 2007). That "undoubted purpose is to assure that the conflict of an attorney who had substantial access to the former client's confidences and legal strategies will be imputed to the attorney's new firm." *Id.*  As recounted above, the Commission believed that in some circumstances, permitting screening where "the attorney leading the transaction for one party actually goes to the other firm . . . would simply be too much." *Pub. Hr. Tr.* at 34.  Assuring imputation of a conflict where the attorney obtained "substantial access to the former client's confidences and legal strategies," *Pelle*, 2007 WL 674723, at *5, is achieved equally in a pre-litigation situation.

By contrast, requiring the existence of a formal "proceeding" is, at least in some circumstances, an artificial and underinclusive dividing line.  Countless situations involve legal advice from trusted counselors on important and sensitive issues that occur well before any formal "proceeding" begins.  To name a few: a company's general counsel gives daily legal advice to board members and senior executives on a range of important issues facing the company; a company's outside corporate lawyer advises the client on mergers, capital raises, infrastructure investments, and other corporate transactions; external employment counsel

advises on compensation, retention, and/or termination decisions for the company's employees; and a real estate lawyer gives advice about the specifics of a particular acquisition.  All of these situations may involve counsel giving confidential legal advice in the absence of a formal "proceeding," but which could later ripen into litigation or other formal legal action.  The concerns animating the rule are equally present in these scenarios as in the more common situation involving a lawyer switching firms during a lawsuit.  In these scenarios, permitting screening of that "main man or woman" who gave the pre-"proceeding" advice and, in doing so, obtained sensitive client information, seems equally "too much" as well.  *See Pub. Hr. Tr.* at 34; *N.J. Attorney Ethics*, § 25:3-1(a) (concluding that "the term 'proceeding' extends to litigation and transaction matters, since they present confidentiality and loyalty concerns when an attorney switches sides").[23]

For these reasons, RPC 1.10(c)'s history and overall purpose, like the rule's text, support a broader reading of "proceeding" that is synonymous with "matter."

### c.    Case Law

Finally, the Court looks to precedent.  As the Court noted above, however, there is no controlling decision or, for that matter, any case law from this Court, the New Jersey state courts, or any other court discussing or analyzing the meaning

---

[23]    To be clear, while the Court concludes that a broader interpretation of "proceeding" is more in line with the rule's general purpose than a narrower one, that is not to say the Court thinks the Commission specifically intended to prohibit screening in this situation.  Indeed, the historical record and dearth of case law on the subject give the Court substantial reason to doubt that the Commission ever considered conflicts arising in this context.

of "proceeding" in RPC 1.10(c)(1).  To the extent that the available case law bears on the question at all, it provides little insight.

Sun relies on several cases from this Court and the New Jersey Supreme Court, but they are not on point.  *See* [Dkt. 318] at 3, 25, 31-35 (citing *Martin*, 2011 WL 5080255, at *1, *4-6; *Bittner v. Waterford Twp. Sch. Dist.*, No. 18-10990 (KMW), 2020 WL 10184581, at *4 (D.N.J. Apr. 27, 2020); *In re: Gabapentin Patent Litig.*, 407 F. Supp. 2d 607, 608-09, 611, 615-16; *Pelle*, 2007 WL 674723, at *1; *Ford*, 2011 WL 5080347, at *3-9).  Biofrontera is largely correct that these cases occurred in the context of a lawyer who switched sides during pending litigation or criminal prosecutions.  Accordingly, Sun's cases do not directly support its broader reading of "proceeding" to extend to legal representation entirely antecedent to a pending lawsuit or other formal action.  *See* [Dkt. 331] at 20-21.  On the flip side, however, none of these decisions analyzed the meaning of "proceeding" or drew the distinction that Biofrontera proposes to draw.  So the happenstance that the lawyers' conflicts in those cases arose out of pending lawsuits and prosecutions helps only, if at all, to show that imputation and screening issues arise most often in that factual context. It does not answer the question whether "proceeding" extends beyond it.

This Court's decision in *Ford* requires more discussion.  There, a client, WWM, retained a lawyer to represent it before filing suit, specifically "to coordinate WWM's litigation efforts against Ford for Ford's alleged distribution of contaminated" concrete to WWM.  *Ford*, 2011 WL 5080347, at *2.  In connection with that litigation-focused representation, the lawyer prepared a common interest

35

agreement aligning WWM's interests with the interests of another entity, Edgewood, which was then a defendant in a pending lawsuit with Ford regarding the same contaminated concrete. *Id.* at *1-2. During the representation and pursuant to the common interest agreement, the lawyer shared and received confidential information and strategy with both WWM and Edgewood, and he participated in a settlement meeting that included representatives of WWM, Edgewood, and Ford. *Id.* at *3-6. Ultimately, the lawyer ceased work for WWM nearly four years before WWM sued Ford, and he left his law firm more than three years before the suit began. *Id.* at *2. Shortly after WWM filed its suit against Ford, however, the lawyer's new firm entered its appearance on behalf of Ford in both the WWM action and the still-pending Ford–Edgewood suit. *Id.* at *2. Despite his prior representation of WWM and the common interest agreement with Edgewood, the lawyer himself appeared at a deposition representing Ford in the Ford–Edgewood action. *Id.*

On these facts, the Court granted WWM's and Edgewood's motions to disqualify the lawyer and his new firm from representing Ford in both suits. 2011 WL 5080347, at *1, 9. The bulk of the Court's analysis focused on RPC 1.9(a), and whether the lawyer himself had a disqualifying conflict. The Court held that he did because: (1) he had represented both WWM and Edgewood, the latter representation arising from an implied attorney-client relationship due to the common interest agreement and the lawyer's receipt of Edgewood's confidential information and litigation strategy; (2) both suits were "the same or substantially

36

related to" the lawyer's prior representation of WWM; and (3) Ford's interests in the suits were materially adverse to the interests of both WWM and Edgewood.  *Id.* at *7-8.  After finding the lawyer disqualified under RPC 1.9(a), the Court also concluded that the conflict was imputed to his law firm under RPC 1.10.  *Id.* at *8. The Court did so almost in passing, observing that no party had shown that anyone other than the lawyer had represented WWM, and that the lawyer had "performed substantial work on behalf of WWM."  *Id.*  Quickly concluding that the lawyer had "primary responsibility" for the prior representation of WWM, the Court found his conflict imputed to the entire firm.  *Id.*

Both parties here correctly recite the unusual circumstances in *Ford* to support their positions.  On one hand, as Sun observes, the lawyer's representation of WWM started (and ended) years before WWM sued Ford, and thus long before a formal "proceeding" between WWM and Ford had begun.  Accordingly, as Sun argues, Biofrontera must acknowledge that "proceeding" can include pre-litigation legal advice in the "run up to litigation" and "before formal litigation ensue[s]." [Dkt. 331] at 23.  This proposition is consistent with Sun's position that a current matter can "involve a proceeding" without the existence of a lawsuit or formal action.  On the other hand, Biofrontera is correct that WWM retained the lawyer specifically to coordinate its litigation efforts against Ford; that an implied attorney-client relationship also had formed between the attorney and Edgewood; and that the substantially related Ford–Edgewood suit was pending at the time

37

WWM retained the attorney.  All of this is consistent with Biofrontera's position that the two suits in *Ford* "involve[d]" a prior formal "proceeding."  *Id.*

Both sides have fair points, but the Court in *Ford* did not discuss any of this.  Screening under RPC 1.10(c) was not raised as a possibility in that case, likely because the lawyer himself sought to represent Ford in both suits.  Whatever the case, the Court's only analysis under RPC 1.10(c) concerned whether the lawyer had "primary responsibility" for the representation of WWM.  The decision does not identify the specific "proceeding" that the current suits "involve[d]"—*i.e.*, the pre-litigation advice to WWM, the Ford–Edgewood suit, or both.  More importantly, the Court did not address the scope and meaning of "proceeding" in RPC 1.10(c)(1).  Like Sun's other cases, *Ford* ultimately yields little insight.

Sun also argues in its reply brief that the New Jersey Supreme Court's decision in *Twenty-First Century Rail* is "controlling" here.  [Dkt. 339] at 4-5.  That is incorrect.  *Twenty-First Century Rail* concerns only RPC 1.9(a) and does not cite, let alone analyze, RPC 1.10(c).  The case arose in the context of a lawyer and his law firm's pre-litigation representation of one client and his and his law firm's subsequent representation of another client in ensuing litigation in which that client's interests were adverse to the former client.  *See* 44 A.3d at 593-95.  But the same lawyer and the same law firm represented both clients, and so the case did not concern a lawyer switching sides and joining a new firm.  In holding that RPC 1.9(a) required disqualification of the lawyer and his firm, the Supreme Court's analysis focused only on RPC 1.9(a) and whether the two matters at issue were the "same,"

thereby creating a disqualifying conflict. *Id.* at 598-601. The Court did not address RPC 1.10 at all, nor did it discuss imputation, screening, or the meaning of the term "proceeding" in the rule.

Sun's cases, accordingly, do little to move the needle. For its part, Biofrontera seeks only to distinguish Sun's cases as arising in the context of existing actions. Biofrontera identifies no case of its own from this Court or New Jersey state courts that supports its understanding of "proceeding" in RPC 1.10(c)(1).[24] In the end, the case law does not directly support or undermine either party's reading of RPC 1.10(c)(1) and gives little helpful direction on the question presented. Because the case law leaves the Court writing on a blank slate, the Court relies on its analysis already set forth.

### d.    Summing Up

As the Court's extended discussion above reflects, the question presented here is uncertain, unprecedented, and difficult. The Supreme Court of New Jersey or the New Jersey Advisory Committee on Professional Ethics may wish to clarify RPC 1.10(c)(1)'s reference to "proceeding" and, more generally, how to address

---

[24]    In a footnote, Biofrontera cites an Arizona district court opinion interpreting a similar, but not identical, Arizona rule. [Dkt. 331] at 20 n.6 (citing *Roosevelt Irrigation Dist. v. Salt River Project Agric. Improvement & Power Dist.*, 810 F. Supp. 2d 929 (D. Ariz. 2011)). The rule there specifically requires the current matter to involve a prior "proceeding before a tribunal." *Id.* at 947. It thus more precisely defines the scope of the kind of "proceeding" that precludes screening. *Id.* Moreover, the court's analysis focused on the word "involve," not "proceeding." *Id.* In any event, even accepting that *Roosevelt* is consistent with Biofrontera's position, this Court does not give much significance to an out-of-district decision applying another state's rule containing different language.

imputation and screening of conflicts arising from a corporate, regulatory, or transactional lawyer's legal advice to a former client well before litigation unfolds. The need for guidance here seems particularly acute in an age of enormous law firms with hundreds or thousands of lawyers, dozens of offices, and diverse practice groups spread across the globe.

For now, however, applying the tools of interpretation and in the absence of authoritative direction from the New Jersey courts, this Court concludes that Sun's reading of the rule is the best one. The Court holds that the screening prohibition in RPC 1.10(c)(1) is not limited only to matters that involve a lawsuit, trial, hearing, action, or other formal business before a court or tribunal, but extends more broadly to matters for which the conflicted lawyer had primary responsibility.

2. ***Madagan had primary responsibility for the matter that this case involves.***

The question becomes whether Madagan had "primary responsibility" for the matter concerning Sun's promotion of Levulan. He did.

Recall that under the RPCs, "'primary responsibility' denotes actual participation in the management and direction of the matter at the policy-making level or responsibility at the operational level as manifested by the continuous day-to-day responsibility for litigation or transaction decisions." RPC 1.0(h). Sun argues that Madagan had "primary responsibility" for Levulan matters, citing, among other things, his role as primary legal reviewer on Sun's MLR Review Committee, the amount of time that he worked on Sun matters, and his efforts in coordinating a competitive response to Biofrontera's launch of Ameluz. [Dkt. 318]

at 32-33.  In response, Biofrontera argues, among other things, that the MLR Review Committee functioned only to provide regulatory compliance advice and not legal advice for Sun's litigation matters; that Madagan was one of many reviewers and there is no evidence demonstrating he was the "primary" reviewer; and that Sun's evidence shows only that Madagan reviewed few Levulan materials for approval or only reviewed materials well after they were approved.  [Dkt. 331] at 27-29.

The Court has thoroughly reviewed the documentary evidence that both parties have submitted on this issue, including an *in camera* review of numerous internal communications and documents involving Sun and Madagan, over which Sun asserts attorney-client privilege.[25]  Based on this review, the Court has little trouble concluding that Madagan had "primary responsibility" for the matter in which he gave Sun legal advice relevant to Biofrontera's counterclaims.

The documentary record reflects that Madagan was, during the relevant period, the principal legal reviewer on Sun's MLR Review Committee for Levulan issues; in that capacity, he was responsible for implementing Sun's policy for the legal review and approval of Levulan-related materials.  The standard operating procedure for the MLR Review Committee established Sun's policy, which sought to ensure that Sun's advertising, promotional, certain internal, and external materials were consistent with its product labels and applicable law.  [Dkt. 318-13.]  As part

---

[25]    Sun submitted Exhibits 15, 32-38, 41-45, 47-50, 56, and 57 for the Court's *in camera* review.

of his responsibilities, Madagan attended regular MLR Review Committee meetings concerning advertising and promotional materials for Levulan; attended standing weekly meetings to review Levulan materials; and was responsible generally for reviewing Levulan materials to ensure their compliance with FDA regulations and other laws. Sun provided Madagan with a Sun email address to enable his access to its internal review platform so that, as part of his responsibilities on the MLR Review Committee, he could review, comment on, provide direction on, and approve or draft promotional, internal, and educational materials concerning Levulan. These materials included reimbursement flowcharts, speaker and slide decks that include statements on Levulan's capabilities and use, treatment guides, and other educational materials for medical providers that explain CPT codes for Levulan. Some of the materials that Madagan himself reviewed, commented on, and approved are the very materials that Biofrontera now challenges as unlawful in its counterclaims. As the MLR Review Committee's legal reviewer, Madagan exercised extensive discretionary and policy-making authority by providing input, direction, and approval for Levulan promotional and other internal materials.

In his position on the MLR Review Committee, Madagan also had "responsibility at the operational level" evidenced by his "continuous day-to-day responsibility for litigation or transaction decisions." RPC 1.0(h). The record here demonstrates that Madagan exercised continuous day-to-day responsibility for the legal review of proposed Levulan materials. Madagan provided regulatory legal advice to ensure the legality of Sun's promotional materials regarding Levulan.

42

For example, Madagan provided strategic and legal input when Sun launched its competitive response to Biofrontera's Ameluz, reviewing and commenting on documents used to ████████████████████████████████████████ ████████████████████████████████████████. The Court concludes that Madagan's work as legal reviewer on the MLR Review Committee constituted "responsibility at the operational level as manifested by the continuous day-to-day responsibility for litigation or transaction decisions." RPC 1.0(h).[26]

The time that Madagan dedicated to representing Sun also reflects his "primary responsibility" over the Levulan matter now at issue. *See Bittner,* 2020 WL 10184581, at *4 (finding that an attorney who billed 161.1 hours, 98% of the total hours, toward client's case, had primary responsibility); *Martin*, 2011 WL 5080255, at *1, *5 (finding that an attorney who billed 108.2 hours, 63% of the total hours, towards a client's case weighed in favor of finding primary responsibility). As Sun's outside counsel, including his role as legal reviewer, Madagan billed Sun for more than 2,000 hours of legal work over a six-year period. The sheer amount of time that Madagan dedicated to his representation of Sun also weighs in favor of finding that he was the "main man" when it came to Levulan-related legal representation.

---

[26]    Notably, Madagan's attorney profile on the McGuireWoods website states that while employed at another firm, he "[s]erved over 5 years as the ***primary legal advisor*** on promotional review committees for multiple product lines (oncology, dermatology, ophthalmology, psychiatry, other)." [Dkt. 331-3] (emphasis added). Although it does not identify Sun by name, this description fits Madagan's role on Sun's MLR Review Committee to a tee.

Consistent with the documentary evidence, Sun also has submitted sworn declarations of two representatives, who both confirm that Madagan was Sun's primary external counsel insofar as Levulan was concerned. Specifically, Aleen Hosdaghian worked at Sun as a Senior Director of Marketing from August 2015 to November 2020. During that time, she was responsible for Sun's promotional, internal training, and education materials for Levulan. Her declaration confirms that Madagan was the primary legal reviewer with whom she consulted for Levulan issues and that Madagan provided input on draft Levulan materials, particularly materials involving the CPT Codes raised in Biofrontera's counterclaims. According to Hosdaghian, Madagan reviewed those materials and provided comments, redlines, approved, or flagged items that required further discussion. Hosdaghian also states that Madagan was a key player in coordinating Sun's competitive response to Biofrontera's Ameluz, including ███████████████████████████ ████████████████████████████████. Felicia Williams, the Senior Director and Head of Sun's Legal Regulatory Law Division, joined Sun in 2022 and reiterates much of the same, explaining that she approved Levulan materials for production by relying on Madagan's review and approval of those materials, particularly his recommendations on which CPT Codes could or could not be included. These sworn declarations are effectively unrebutted and the Court gives them substantial weight.

In light of the foregoing, Biofrontera's arguments that Madagan did not have "primary responsibility" for his Levulan-related representation of Sun are not

persuasive.  Contrary to Biofrontera's arguments, the fact that other individuals acted as legal reviewers on the MLR Review Committee does not negate Madagan's "primary responsibility" for Levulan matters.  RPC 1.0(h) does not require an attorney to have sole responsibility, nor does it preclude a finding of primary responsibility when an attorney works with other attorneys.  *See Bittner*, 2020 WL 10184581, at *4 (finding that an attorney who was supervised by another attorney does not prevent a finding of primary responsibility); *J.G.S. v. L.M.S.*, No. A-3133-18T1, 2019 WL 6650231, at *4 (N.J. Super. Ct. App. Div. Dec. 6, 2019) (finding that an associate attorney had primary responsibility despite being subject to managing partner's supervision).  The presence or existence of another reviewer on the MLR Review Committee, or even another attorney reviewing Levulan materials, does not diminish Madagan's primary responsibility.  Moreover, many of the cited instances in which another individual reviewed a document for the committee occurred after Madagan had ceased advising Sun altogether.

Applying the factual evidence to RPC 1.0(h)'s definition, the Court concludes that Madagan had "primary responsibility" for the matter concerning Levulan materials that are now at issue in this case.

***

For the reasons set forth above, Madagan is disqualified from representing Biofrontera under RPC 1.9(a) and, as a result of Biofrontera's counterclaims, this case "involves a proceeding in which [Madagan] had primary responsibility." RPC 1.10(c)(1).  The Court therefore concludes that, by its terms as best

interpreted, RPC 1.10 imputes Madagan's disqualifying conflict to McGuireWoods and prohibits the firm from continuing to screen him and, therefore, from representing Biofrontera in this case.

### C.    In all events, however, disqualification of McGuireWoods is not warranted here.

That is not the end of the inquiry. *See Dewey*, 536 A.2d at 251-52. Having presided over this case from the outset; having considered and balanced all relevant circumstances and interests; and having endeavored to approach these sensitive issues with "a keen sense of practicality," *Montgomery Acad.*, 50 F. Supp. 2d at 349 (quoting *Gould*, 738 F. Supp. at 1124), the Court concludes that disqualification is not warranted here. The Court reaches that conclusion for several related reasons.

*First*, the harsh medicine of disqualification is an unjust remedy in these unusual circumstances. *Cf. Alexander*, 822 F. Supp. at 1114 (recognizing that disqualification is "a drastic measure" that should be imposed only "when absolutely necessary"). As the Court's discussion above reflects, this case is unprecedented on multiple levels. No court has decided (or even discussed) the meaning of "proceeding" in RPC 1.10(c)(1), and the interpretive question is a close one. Although the Court ultimately disagrees with it, Biofrontera's reading of the rule is neither implausible nor unreasonable. Moreover, the factual context in which Madagan's conflict arose is itself unique. As the Court has observed, imputation and screening issues in the case law arise most often when litigators advise a client in connection with litigation and then switch to a firm representing the adversary in litigation. This situation is very different from that norm: A non-litigator employed

46

by a large international law firm provided regulatory legal advice to a client and then switched to another large international law firm to provide regulatory, non-litigation advice to other clients with no connection to this suit. The Court sees no indication in the historical record that the Pollock Commission specifically considered this kind of scenario in proposing the screening limitation in RPC 1.10(c)(1). And at oral argument, Biofrontera asserted that no court has ever disqualified a law firm in this context; the Court's own research has identified no case contradicting that assertion. Although the Court has concluded above that the best reading of the rule applies to this situation, it agrees with Biofrontera that, in the balance of things, it would be unfair to penalize it and its chosen counsel on a close question of first impression.

*Second*, compounding the exceptional character of this case is the fact that McGuireWoods did not violate the RPCs in the first instance when it screened Madagan at the time he joined the firm. That is because of a timing idiosyncrasy, in which the imputed conflict arose only once Biofrontera asserted its counterclaims, months after Madagan already had been screened. The parties agree, as does the Court, that Madagan had a disqualifying RPC 1.9(a) conflict from the moment he joined McGuireWoods in July 2024. But by Sun's own admission, RPC 1.10(c) did not prohibit McGuireWoods from screening Madagan at that time. In July 2024, Biofrontera had not yet asserted its counterclaims challenging Sun's promotional statements concerning Levulan, so this case did not "involve" the matter in which Madagan had represented Sun. From Biofrontera's perspective,

47

the litigation was entirely defensive, focusing only on Sun's allegations challenging Biofrontera's promotional activity concerning Ameluz.  There is no suggestion that Madagan advised Sun in that respect, and so Sun properly admitted at oral argument that RPC 1.10(c) imposed no barrier to screening Madagan when he joined McGuireWoods.  Said differently, McGuireWoods fully complied with the rules when it screened him from this case at the outset of his employment.

Sun nonetheless argues that, given this chronology, the burden rested with McGuireWoods to update its July 2024 letter after Biofrontera asserted its counterclaims in October 2024, and then to disclose Madagan's close connection with Sun's promotional activity of Levulan.  Although the Court now holds that RPC 1.10(c) no longer permitted screening as of October 2024, the Court disagrees that McGuireWoods had a continuing duty to provide Sun further information on the issue.  The rules required McGuireWoods to provide prompt written notice to Sun in July 2024, when Madagan "bec[a]me[] associated with [the] firm," in order "to enable [Sun] to ascertain compliance with the provisions of th[e] Rule." RPC 1.10(c)(3).  McGuireWoods complied with that obligation; the rules required no more.  When Biofrontera asserted its counterclaims three months later, Madagan already had been screened from the case, and Sun then knew everything it needed to know to "ascertain compliance" with RPC 1.10(c).  By then, Sun was in the best position to determine whether Madagan had primary responsibility for the matter that Biofrontera's counterclaims had injected into this case.

In light of McGuireWoods's undisputed compliance with the screening rules at the outset, what developed later hardly reflects a flagrant violation of the rules, particularly in the absence of controlling legal authority governing these circumstances. Madagan is a non-litigating, regulatory lawyer who, pursuant to the ethics screen, has had no involvement with this case since joining McGuireWoods. If he could be effectively and permissibly screened between July 2024 and October 2024, it is difficult to see why screening would be any less effective, as a practical matter, after October 2024, even if it no longer complies with the rules as the Court has now interpreted them. In the Court's view, the unusual chronology in which the imputed conflict arose also tends to make disqualification here an unnecessary and unduly penal remedy.

*Third*, Sun's protracted delay in raising the conflict dispute weighs heavily against disqualifying McGuireWoods now. Sun is correct that it had neither reason nor basis to move for McGuireWoods's disqualification until October 2024 when Biofrontera asserted its counterclaims. Yet that was still more than a year before Sun filed this motion. In the intervening year, the parties and their counsel devoted substantial time, energy, and expense to this litigation. During that period, Sun— through its current and former employee-witnesses and its internal and external counsel—reasonably should have identified Madagan's involvement with Sun's promotional activity far, far earlier than it did. Sun's motion papers explain why that did not happen, and the Court understands the realities of litigation and accepts Sun's explanations as a matter of fact. Whatever the reasons, however, the

49

delay cannot be overlooked or excused; this litigation proceeded along in the normal course much longer than it should have before Sun raised the issue. We are now nearly complete with an extended and intensive period of written discovery; we are in the midst of fact depositions; and expert discovery is right around the corner. While not on the eve of trial, this case hardly is in its infancy. The Court agrees with Sun that delay alone typically is an insufficient reason to deny a motion to disqualify. But delay is most assuredly a relevant factor in the overall balance. *See Mir*, 2024 WL 5001747, at *7. When considered with other factors, Sun's extended delay in this case counsels heavily against disqualifying McGuireWoods at this juncture.[27]

*Fourth*, Sun's claim of prejudice is significantly overstated. Sun does not assert that Madagan or McGuireWoods have violated the ethics screen in any way, nor does it express real concern that they will do so in the future. Sun's concern is of a different kind: It says that Madagan's conflict creates a dilemma that harms its ability to defend against Biofrontera's counterclaims: "Without disqualification, Sun Pharma would be forced to either subpoena Mr. Madagan (and necessarily waive privilege) or not approach him at all. Sun Pharma should not be forced into

---

[27]    The Court need not decide whether disqualification would have been appropriate if Sun had raised the issue earlier. *Cf. Cardona*, 942 F. Supp. at 976 (noting that "[t]he decision whether to disqualify a law firm by imputation is best undertaken on a case-by-case basis, weighing the facts as they exist at the time the motion to disqualify is made."). Whatever the ultimate result, the balance of equities surely would have been different than they are today. *See Dewey*, 536 A.2d at 252 (noting that "on a different factual record a different analysis might be resorted to and a different result might be required").

this binary position." [Dkt. 318] at 2. The premise of this supposed dilemma is Sun's stated desire to "hav[e] a privileged conversation with Mr. Madagan to understand his rationale" for approving the materials that Biofrontera challenges. *Id.* But the circumstances here give substantial reason to question the premise, and the dilemma does not really exist in any event.

For starters, if Sun had thought it so fundamentally important to speak with its former regulatory counsel in developing its defenses to Biofrontera's counterclaims, Sun would have identified Madagan (and the conflict) far earlier than it did. That it failed to do so speaks volumes about the reasons behind its stated desire to speak with him now. It also eviscerates Sun's suggestion that speaking to Madagan would help inform its decision whether to waive privilege and assert an advice-of-counsel defense at this late stage of the case. Before this motion—which Sun filed a full year after it answered the counterclaims and asserted affirmative defenses to them—Sun has never once hinted that it might consider an advice-of-counsel defense and it has studiously endeavored to protect its attorney-client privilege in this case.[28] Having litigated the case without indicating a need or desire to speak with its primary regulatory lawyer or an interest in waiving privilege, Sun's present suggestion that speaking to Madagan now would help it make that decision rings especially hollow. The record leaves the Court with

---

[28] Sun's effort to protect its privilege extends to this very motion, in which it submitted 19 exhibits containing privileged communications for the Court's review *in camera.*

the firm impression that Sun's newfound desire to speak with Madagan is custom tailored for this motion.

In any event, Sun presents a false dilemma.  Biofrontera and McGuireWoods do not object to Sun having exactly what it says it wants:  "a privileged conversation with Mr. Madagan to understand his rationale for approving" the materials at issue.  [Dkt. 318] at 2.  Indeed, McGuireWoods has offered to make Madagan available to speak with Sun in a privileged setting for that purpose.  Permitting Sun to speak with Madagan in this fashion, in these circumstances, strikes the Court as precisely the kind of practical and "equitable solution[] to a conflict problem" that will do no damage to "the high ethical standards of the profession."  *Wyeth*, 692 F. Supp. 2d at 458.  At the Court's direction, the parties submitted supplemental letter briefs addressing whether anything precludes him from doing so.  [Dkts. 357, 358.]  Having reviewed those submissions, the Court agrees with Biofrontera that no law, RPC, or ethical rule precludes Madagan from speaking with his former client in a privileged setting and providing information about his past legal advice to it.[29]

---

[29]    Biofrontera suggests that Madagan may be affirmatively obligated under RPC 1.16(d) to provide information to Sun in these circumstances.  [Dkt. 357] at 1-2 (citing RPC 1.16(d); ABA Formal Op. 520, *A Lawyer's Obligation to Convey Information to a Former Client or Successor Counsel* (Jan. 21, 2026)).  The Court expresses no view on that question, except to note that the cited ABA opinion may not be as helpful as Biofrontera believes.  *See* ABA Formal Op. 520, at 5 (explaining that a lawyer who represented a client in a completed business transaction "would not have an obligation under Rule 1.16(d) to comply with a request for information to be used in a subsequent lawsuit between the parties to the transaction, because that would be a new matter, even though it grew out of the transaction in which the lawyer provided legal services").  Regardless whether Madagan is obligated to

52

Sun's supplemental brief argues that a privileged conversation between it and Madagan would violate the RPCs' screening and conflict-of-interest provisions (RPCs 1.0(l), 1.7, 1.9, 1.10) because the screen prevents Madagan from having "any participation" in this case and because the privileged conversation would cause a concurrent conflict of interest. [Dkt. 358] at 2. The Court disagrees on both accounts. In line with the rules, McGuireWoods erected the ethics screen to preclude Madagan's involvement in the case on behalf of *Biofrontera*, the entity adverse to his former client. The screen results, by definition, in Madagan having no interest in Biofrontera's case here, and thus the Court cannot agree with Sun that Madagan is "aligned with" Biofrontera in any respect. *Id.* Moreover, a privileged conversation in which Madagan provides information regarding his past legal advice to his former client does not result in him "representing" either party in this case and so will not, as the Court sees it, result in a concurrent conflict of interest, a violation of the ethics screen, or "participation" in this case within the meaning of the screening rules.

In short, Sun doth protest too much. If Sun really wants to "hav[e] a privileged conversation with Mr. Madagan" concerning his past legal advice, [Dkt. 318] at 2, it may have one with him. To be clear, the Court does not, as Sun insinuates, hold that a conversation between Sun and Madagan represents a kind of cure for a violation of the rules. The Court simply observes that Sun may have

---

provide information to Sun about his past legal advice, the Court sees no ethical prohibition in him doing so.

exactly what it says it wants. Of course, if Sun elects not to pursue this option, then it will be no differently situated than it has been for most of this litigation—content to defend against Biofrontera's counterclaims without having endeavored to speak with its former regulatory counsel. Whatever the case, the Court finds Sun's stated fear of prejudice to be slight, if not entirely non-existent.[30]

*Fifth*, by contrast, the Court agrees with Biofrontera that it would suffer significant and unfair harm if its chosen counsel is disqualified at this late stage of the case. *See generally Alexander*, 822 F. Supp. at 1117-18 (denying motion to disqualify at late stage of litigation in part because of significant investment of time and money in firm's representation of a client in litigation). By any measure, McGuireWoods has devoted a substantial amount of time and effort defending Biofrontera in this case (and years before that in the Massachusetts litigation, the settlement of which led to this case). According to Biofrontera, McGuireWoods has spent more than 2,500 hours representing it in all aspects of this case with the ethics screen in place, and many more before that, resulting in millions of dollars in attorneys' fees. *See id.* (denying motion where law firm had "devoted thousands of hours to th[e] litigation and hundreds of thousands of dollars in [the client's]

---

[30]    McGuireWoods represents that it "fully expects" Madagan to participate voluntarily in a privileged meeting with Sun. [Dkt. 357] at 3. In light of that representation, the Court will not at this time order Madagan to speak with Sun, but will consider more assertive action if that proves necessary. The Court will direct McGuireWoods's general counsel to supply this opinion and the accompanying order to Madagan and otherwise assist (only if necessary) with scheduling and logistics of a meeting with Madagan, if Sun seeks one. The Court declines Biofrontera's suggestion to regulate, *ex ante*, the parameters of such a meeting. McGuireWoods shall maintain its ethics screen at all times.

defense"); [Dkt. 331] at 31. More importantly, the issues in this case are complex and significant, and McGuireWoods has been immersed in representing BFRI from the outset (and the foreign defendants since July 2025), and in doing so has "become uniquely acquainted with the relevant facts and legal issues in this case." *Id.* Disqualifying McGuireWoods now would upend years of developing its familiarity with the complexities and nuances of the case, requiring Biofrontera to obtain new counsel "completely unfamiliar with the morass of facts and legal issues." *Id.* While perhaps not an existential threat, the prejudice to Biofrontera from disqualifying McGuireWoods at this point would be, in the Court's view, immense and unfair.

*Finally*, separate and apart from the harm to Biofrontera, the Court is mindful of the substantial delay in the litigation that would result from disqualifying McGuireWoods. *See Prudential*, 2017 WL 1549466, at *3 (noting that even motions to disqualify made in good faith "cause inevitable delay in the underlying proceedings"); *Alexander*, 822 F. Supp. at 1118 (recognizing that "substantial delay" would ensue if the client were forced to locate capable substitute counsel). This case is nearly three years old already, and the parties and the Court have an abiding interest in achieving its resolution as expeditiously as possible. Disqualifying McGuireWoods at this point would result in months, perhaps years, of additional delay while a new firm gets up to speed. While such a delay would, of course, be tolerable if the Court believed it truly necessary, here it does not, for the

reasons given above.  The potential for substantial unneeded delay also factors into the Court's determination that disqualification is unwarranted in this case.

***

The conflict issue before the Court is extraordinary in many respects. The Court has undertaken a painstaking review of the facts and the law and it has done so with full appreciation of the unusual context, chronology, and circumstances in which this dispute has arisen.  In the Court's judgment, this is the rare case in which the balance of equities tips decisively against disqualification and in favor of allowing Biofrontera to maintain its counsel of choice.  Permitting McGuireWoods to continue to represent Biofrontera in this case, at this juncture, will cause no significant harm to Sun and will avoid significant harm to Biofrontera and avoid significant additional delay in the litigation.  Most importantly, the Court is confident that denying the motion here will not in any respect undermine the highest professional standards that the RPCs are designed to uphold and that this Court is charged to enforce.

The Court concludes on this record that the drastic measure of disqualifying McGuireWoods is neither necessary nor appropriate.  Accordingly, the Court will deny Sun's motion.

## IV.    CONCLUSION

For the reasons stated, Sun's motion to disqualify McGuireWoods will be denied.  An appropriate order follows.

J. BRENDAN DAY
UNITED STATES MAGISTRATE JUDGE

February 25, 2026